UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ERIC GREEN,

            Plaintiff,

v.                                    Case No. 3:02-cv-70-J-99MMH

WILLIAM MATHEWS, et al.,

            Defendants.

_____

## ORDER

### I. Status

On January 28, 2002, Plaintiff Eric Green initiated this action by filing a civil rights complaint (Doc. #1) (hereinafter Complaint).  He named the following individuals as the Defendants in this action:  (1) William Mathews; (2) James Crosby; (3) Michael Moore; (4) William Hall; (5) Sergeant Lynn; (6) Sergeant Wilson; (7) Sergeant Chastain;[1] (8) Sergeant Kontaxis; and, (9) Sergeant Anders.  They were all current or former employees of the Florida Department of Corrections and they were all sued in their individual capacities.  On August 2, 2002, this Court dismissed, without prejudice, Defendants Sergeant Wilson, Captain Chastain, William Hall and Sergeant Kontaxis.  See the Court's Order (Doc. #19), filed August 2, 2002.

Defendants Mathews, Lynn, Crosby, Moore and Anders filed a Motion to Dismiss and Motion for Summary Judgment (Doc. #21) on

---

[1] Defendant Chastain was actually a Captain, not a Sergeant, and he will hereinafter be referred to as Captain Chastain.

August 29, 2002.  The original affidavits of J. S. Lynn and G. S. Anders were filed on September 6, 2002.[2]  The Defendants were ordered to provide the Court with a copy of the Institutional Operating Procedures related to Chapter 33 of the Florida Administrative Code *in camera*, and they did so.  <u>See</u> Defendants' Notice of Partial Compliance with Court's October 27, 2003 Order (Doc. #53), filed November 3, 2003.

Plaintiff's May 24, 2004, Motion for Leave to File an Amended Complaint (Doc. #77) was denied; however, Plaintiff was allowed to reinstate Defendants Hall, Wilson and Chastain since they were named in the original complaint and Plaintiff had repeatedly tried to obtain their addresses to complete service of process.  The reinstatement was limited to the allegations raised in the original complaint, with an extensive explanation for that holding provided in the order.[3]  <u>See</u> the Court's Order (Doc. #90), filed September

---

[2] Plaintiff was made aware of the provisions of Rule 56 concerning summary judgment in the Court's Order (Doc. #6), filed March 20, 2002, and given an opportunity to respond to the Defendants' motions for summary judgment.

[3] In brief, the Court agreed with Defendants that Plaintiff was attempting to circumvent summary judgment by changing his complaint in significant ways without a reasonable explanation, particularly since the matters are those of which Plaintiff should have been aware of or was aware of all along, and significantly because the four-year statute of limitations had already run and a year and one-half of discovery had been conducted.  In particular, Plaintiff was not allowed to change his claim to allege that the other Defendants knew that Hall was directed by Chastain to smash Plaintiff's face on the floor, nor was he allowed to change the complaint to state that Chastain ordered the smashing of Plaintiff's face and Hall heeded the order because Plaintiff had previously been disrespectful to Hall.  Nor was he allowed to introduce a new conspiracy claim alleging the above.

10, 2004.  Thus, Defendant Kontaxis is the only Defendant that was not reinstated.

Plaintiff filed a Response to Defendants' Summary Judgment Motion (Doc. #92) on November 4, 2004.  The Court notes that Plaintiff essentially ignored the Court's Order of September 10, 2004, and included the conspiracy theory and the other proposed amended claims against the Defendants in his response.  Since the motion to amend the complaint was denied, the Court will not consider these assertions and any portions of the affidavits or other documents concerning these allegations.  The Court will not allow Plaintiff to circumvent the ruling of the Court by attempting to amend his complaint through his responses to the motions for summary judgment.

Defendant Wilson filed an Answer (Doc. #94) to the Complaint on November 8, 2004.  The Defendants filed a Supplement to Motion to Dismiss and Motion for Summary Judgment (Doc. #103) on January 11, 2005.  Plaintiff filed his Supplemental Response to Defendants' Supplement to Summary Judgment Motion (Doc. #115) on April 13, 2005.

**II. Plaintiff's Allegations and Claims in the Complaint**

Under the Statement of Claim portion of the Complaint, Plaintiff raises the following claims: (1) Defendant Hall's use of excessive force constituted a violation of the Eighth and Fourteenth Amendments of the United States Constitution and

3

constituted a violation of Florida tort law on assault and battery;
(2) Defendants Lynn, Anders, Wilson and Chastain's failure to
intervene to prevent the misuse of force by Defendant Hall violated
the Eighth Amendment of the United States Constitution; (3)
Defendants Moore and Crosby's failure to take disciplinary actions
or other actions to curb Defendant Hall's use of excessive force or
pattern of abuse of inmates and/or to remove him from the Cell
Extraction Team resulted in the failure to prevent the assault of
Plaintiff by Defendant Hall, which violated the Eighth Amendment of
the United States Constitution and constituted the tort of
negligence under Florida law; (4) Defendant Mathews failure to
provide Plaintiff with pain pills and a liquid diet constituted the
deliberate indifference to Plaintiff's serious medical needs in
violation of the Eighth Amendment of the United States Constitution
and constituted the tort of negligence under Florida law.

Under the Statement of Facts, Plaintiff alleges the following
facts.  Plaintiff, on October 16, 1999, was confined at Florida
State Prison (hereinafter FSP) on suicidal observation status.  At
9:30 p.m., he showed Sergeant McDougal, Officer Beecham and Nurse
Myers-Barrett a razor blade, which was inside of his mouth.
Plaintiff told them he would exchange the razor blade for his
mattress, suicidal blanket and shroud.  Those items had been taken
from him by Lieutenant Anderson, Sergeant McDougal and Officer
Beecham, under the direction of Nurse Roberts, because Plaintiff

had used the shroud to cover his cell door window.  Nurse Myers-Barrett ordered Plaintiff to give her the razor blade, and Plaintiff refused.  Sergeant McDougal ordered Plaintiff to give the razor blade to the nurse, and Plaintiff refused.  At that point, Sergeant McDougal instructed Officer Beecham to notify Lieutenant Anderson of the situation.  Plaintiff states he swallowed the razor blade in the presence of Sergeant McDougal and the nurse.

Lieutenant Anderson came to the wing and ordered Plaintiff to submit to handcuffs so the cell could be searched for the razor blade.  Plaintiff submitted to being handcuffed, and both his cell and person were searched.  The razor blade was not found.  Lieutenant Anderson, Sergeant McDougal, Officer Beecham and Nurse Myers-Barrett left Plaintiff's cell.

At 12:15 a.m., Sergeant Starling came to Plaintiff's cell and ordered him to give up the razor blade, and Plaintiff told him it was in his stomach.  Sergeant Starling left, stating he would return with the Captain.  At 12:30 a.m., Defendant Chastain ordered Plaintiff to give up the razor blade.  Plaintiff told him he swallowed it.  Chastain left, stating Plaintiff would regret not giving up the razor blade.  At 2:30 a.m., Chastain woke Plaintiff up, Plaintiff approached his cell door, and Chastain ordered Plaintiff to give up the razor blade.  Defendant Chastain ordered an officer to activate a spot light.  Chastain instructed the Cell Extraction Team to enter Plaintiff's cell.  Defendants Hall,

Anders, Lynn and Wilson entered Plaintiff's cell, along with Sergeant Kontaxis. Officer Burns stood behind them videotaping with a videocamera. Plaintiff extended his arms out in front of him against the shield that was being wielded by Defendant Lynn. Lynn forced Plaintiff's back up against the wall. Once Plaintiff was against the wall, another member of the Team grabbed the Plaintiff's legs and pulled them out from under him until he slid on his buttocks to a sitting position. Plaintiff's legs were pulled again, and he slid flat on his back. He was then instructed to turn over and place his hands behind his back. Plaintiff turned over and placed his hands behind his back. Leg irons and handcuffs were applied.

An inmate, John Myers, yelled out to Plaintiff asking if he was alright. Plaintiff yelled out "Yeah." Defendant Hall grabbed Plaintiff's head, lifted it up high in the air for a few seconds while telling Plaintiff to "shut the fuck up." Hall then rammed Plaintiff's face into the floor. Plaintiff sustained a chipped tooth, a cracked tooth, a puncture in his lower lip, a laceration on his inner lower lip area and a laceration on his outer lower lip.

Kontaxis and Defendants Chastain, Lynn, Anders and Wilson did not intervene to prevent Defendant Hall from ramming Plaintiff's face into the floor. Plaintiff did not resist any member of the Team.

6

Plaintiff states that Defendant Hall has repeatedly engaged in excessive and unlawful force against inmates, that Defendants Moore and Crosby had been placed on notice of the abusive conduct of Hall as well as other officers at FSP by letters, complaints and grievances, but failed to take disciplinary or other actions against them to control their assaultive behavior, and that Moore and Crosby, although being aware of Hall's tendency to use excessive force, allowed him to remain on the Cell Extraction Team. Plaintiff states that Defendants Moore and Crosby failed in their duties to properly hire, train, assign, direct, supervise and discipline officers, and this failure led correctional officers to believe that they could violate inmates' rights with impunity.

After the Team action, Plaintiff was taken to the infirmary where he received butterfly sutures for the laceration of his outer lip and treatment for his other injuries. He was referred to a physician for evaluation. The following day, October 18, 1999, Plaintiff was examined by Defendant Mathews. Plaintiff informed Mathews he was experiencing tremendous pains in his upper and lower teeth, which prevented him from chewing any solid food. Plaintiff requested a liquid diet and pain pills. Mathews did not prescribe a liquid diet or pain pills. Instead, Mathews sent Plaintiff to the X-ray lab to have X-rays taken of his face. X-rays were taken and no damage was discovered. Mathews also sent Plaintiff to the dentist to obtain X-rays of his upper and lower teeth. The X-rays

of Plaintiff's teeth were rescheduled to a later date due to the pain Plaintiff was experiencing when the dentist tried to obtain the X-rays.  A week later, Plaintiff returned to the dentist and the X-rays were taken.  The X-rays revealed a cracked tooth and a chipped tooth, which were later repaired.  Plaintiff was prescribed pain pills after the X-rays were taken.

Plaintiff complains he suffered tremendous pain for over a week due to not being prescribed a liquid diet or pain pills by Defendant Mathews.  He claims he suffered pain in his mouth and unnecessary hunger pains, which resulted in mental anguish and distress.  He also suffered nightmares, loss of sleep, paranoia and emotional distress.  Several weeks later, the nerves in the chipped tooth began dying and a root canal was performed.

Plaintiff states that Defendant Chastain was the officer-in-charge at FSP during the 12:00 a.m. to 8:00 a.m. shift, Defendant Crosby was in charge of the supervision and discipline of all employees at FSP, Defendant Moore was responsible for the supervision and discipline of all of the employees of the Florida Department of Corrections and Defendant Mathews was responsible for providing medical care to inmates.

Plaintiff asserts that all of the Defendants were acting under the color of state law, each Defendant is sued in his individual capacity, and he alleges the torts of assault and battery and negligence.  As relief, Plaintiff seeks a declaratory judgment that

8

the physical abuse resulted in a violation of the Eighth Amendment and constituted an assault and battery under state law, that Moore and Crosby's failure to curb the physical abuse of prisoners violated the Eighth Amendment and constituted an assault and battery and negligence under state law and that Matthew's failure to provide adequate medical care violated the Eighth Amendment and constituted negligence under state law.  Plaintiff also seeks compensatory damages against Defendants Hall, Lynn, Anders, Wilson Chastain, Moore and Crosby for physical, psychological and emotional injuries as a result of the assault.  Plaintiff seeks compensatory damages against Defendant Mathews for the physical, psychological and emotional injuries resulting from Mathews' failure to provide adequate medical care.  Finally, Plaintiff seeks punitive damages against Defendants Hall, Lynn, Anders, Wilson, Chastain, Moore, Crosby and Matthews.

### III. Summary Judgment Standard

With respect to the standard for granting summary judgment, the Eleventh Circuit Court of Appeals has stated:

> [S]ummary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

9

In re Optical Technologies, Inc., 246 F.3d 1332, 1334 (11th Cir. 2001).

The parties' respective burdens and the Court's responsibilities are outlined as follows:

> The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. Taylor v. Espy, 816 F.Supp. 1553, 1556 (N.D. Ga. 1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. Matsushita Electric Industrial Co. v. Zenith Radio Corp.[,] 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).
>
> Applicable substantive law will identify those facts that are material. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. Id. For factual issues to be considered genuine, they must have a real basis in the record. Matsushita, 475 U.S. at 586-87, 106 S.Ct. at 1355-56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be

10

> tried.  <u>Anderson</u>, 477 U.S. at 249, 106 S.Ct.
> at 2135.  The Court must avoid weighing
> conflicting evidence or making credibility
> determinations.  <u>Id</u>. at 255, 106 S.Ct. at
> 2513-14.  Instead, "[t]he evidence of the non-
> movant is to be believed, and all justifiable
> inferences are to be drawn in his favor."  <u>Id</u>.
> Where a reasonable fact finder may "draw more
> than one inference from the facts, and that
> inference creates a general issue of material
> fact, then the court should refuse to grant
> summary judgment."  <u>Barfield v. Brierton</u>, 883
> F.2d 923, 933-34 (11th Cir. 1989) (citation
> omitted).

<u>Hairston v. Gainesville Sun Pub. Co.</u>, 9 F.3d 913, 918-19 (11th Cir.

1993); <u>see</u> <u>Mulhall v. Advance Sec. Inc.</u>, 19 F.3d 586, 589-90 (11th

Cir.), <u>cert</u>. <u>denied</u>, 513 U.S. 919 (1994).

"It is true that on a motion for summary judgment, all

reasonable inferences must be made in favor of the non-moving

party."  <u>Cuesta v. School Bd. of Miami-Dade County</u>, 285 F.3d 962,

970 (11th Cir. 2002) (citation omitted).  "A court need not permit

a case to go to a jury, however, when the inferences that are drawn

from the evidence, and upon which the non-movant relies, are

'implausible.'"  <u>Id</u>. (citations omitted).

> If a reasonable jury could not find in favor
> of the nonmoving party, no genuine issue of
> material fact does exist; and summary judgment
> is proper.  <u>Beal v. Paramount Pictures Corp.</u>,
> 20 F.3d 454, 459 (11th Cir. 1994).  A mere
> scintilla of evidence in support of the
> nonmoving party will not suffice to overcome a
> motion for summary judgment.  <u>Allen v. Tyson
> Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir.
> 1997).  As Fed.R.Civ.P. 56(e) states, "When a
> motion for summary judgment is made and
> supported as provided in this rule, an adverse
> party may not rest upon the mere allegations

> or denials of the adverse party's pleading,
> but the adverse party's response, by
> affidavits or as otherwise provided in this
> rule, must set forth specific facts showing
> that there is a genuine issue for trial."

<u>Young v. City of Palm Bay, Fla.</u>, 358 F.3d 859, 860 (11th Cir. 2004).  Thus, "[s]ummary judgment should be granted when, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case."  <u>Nolen v. Boca Raton Community Hospital, Inc.</u>, 373 F.3d 1151, 1154 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

## IV. Law and Conclusions

### A.   Denial of Medical Care

With regard to Plaintiff's claim of being subjected to cruel and unusual punishment in violation of the Eighth Amendment, the Eleventh Circuit has stated:

> Although the United States Constitution
> does not require comfortable prisons, neither
> does it permit inhumane ones.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S.Ct. 1970,
> 128 L.Ed.2d 811 (1994).  The Eighth Amendment
> governs "the treatment a prisoner receives in
> prison and the conditions under which he is
> confined."  <u>Helling v. McKinney</u>, 509 U.S. 25,
> 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).
> However, "[n]ot every governmental action
> affecting the interests or well-being of a
> prisoner is subject to Eighth Amendment
> scrutiny."  <u>Whitley v. Albers</u>, 475 U.S. 312,
> 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).
> "After incarceration, only the 'unnecessary
> and wanton infliction of pain' . . .
> constitutes cruel and unusual punishment
> forbidden by the Eighth Amendment."  <u>Ingraham</u>

> > v. Wright, 430 U.S. 651, 670, 97 S.Ct. 1401,
> > 51 L.Ed.2d 711 (1977) (quoting Estelle v.
> > Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50
> > L.Ed.2d 251 (1976) (citations omitted)).

Farrow v. West, 320 F.3d 1235, 1242-43 (11th Cir. 2003).

With reference to the denial of medical care, the Eleventh

Circuit further explained:

> > In Estelle v. Gamble, the Supreme Court
> > held that a prison official's "deliberate
> > indifference to [the] serious medical needs of
> > [a] prisoner[ ] constitutes the unnecessary
> > and wanton infliction of pain . . . proscribed
> > by the Eighth Amendment." Estelle, 429 U.S.
> > at 104, 97 S.Ct. 285 (quotation marks and
> > citation omitted); see Campbell v. Sikes, 169
> > F.3d 1353, 1363 (11th Cir. 1999). "However,
> > not 'every claim by a prisoner that he has not
> > received adequate medical treatment states a
> > violation of the Eighth Amendment.'"
> > McElligott v. Foley, 182 F.3d 1248, 1254 (11th
> > Cir. 1999) (citation omitted); see Estelle,
> > 429 U.S. at 106, 97 S.Ct. 285 ("Medical
> > malpractice does not become a constitutional
> > violation merely because the victim is a
> > prisoner."). The inadvertent or negligent
> > failure to provide adequate medical care
> > "cannot be said to constitute 'an unnecessary
> > and wanton infliction of pain.'" Estelle, 429
> > U.S. at 105-06, 97 S.Ct. 285.

Farrow, 320 F.3d at 1243.

When describing deliberate indifference to a serious medical

need, the Eleventh Circuit has stated:

> > "To show that a prison official acted
> > with deliberate indifference to serious
> > medical needs, a plaintiff must satisfy both
> > an objective and a subjective inquiry."
> > Farrow v. West, 320 F.3d 1235, 1243 (11th Cir.
> > 2003). First, the plaintiff must prove an
> > objectively serious medical need. Id.
> > Second, the plaintiff must prove that the

13

prison official acted with deliberate
indifference to that need.

"A serious medical need is considered
'one that has been diagnosed by a physician as
mandating treatment or one that is so obvious
that even a lay person would easily recognize
the necessity for a doctor's attention.'" <u>Id</u>.
(citing <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>,
40 F.3d 1176, 1187 (11th Cir. 1994)). In
either case, "the medical need must be one
that, if left unattended, pose[es] a
substantial risk of serious harm." <u>Id</u>.
(citation and internal quotations [sic] marks
omitted). . . .

To establish the second element,
deliberate indifference to the serious medical
need, the prisoner must prove three facts:
(1) subjective knowledge of a risk of serious
harm; (2) disregard of that risk; and (3) by
conduct that is more than mere negligence.
<u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th
Cir. 1999).

<u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004).

Thus, a plaintiff must prove, in order to show a sufficiently
serious deprivation made with the subjective intent to punish, that
a defendant had "knowledge of a serious medical risk and a
disregard of that risk by conduct that is more than mere
negligence." <u>Flowers v. Bennett</u>, 135 F.Supp.2d 1150, 1154 (N.D.
Ala. 2000) (citations omitted). Wanton conduct can be "treatment
'so cursory as to amount to no treatment at all[,]'" <u>Taylor v.
Adams</u>, 221 F.3d 1254, 1259 (11th Cir. 2000) (citing <u>Ancata v.
Prison Health Servs., Inc.</u>, 769 F.2d 700, 704 (11th Cir. 1985)),
<u>cert</u>. <u>denied</u>, 531 U.S. 1077 (2001), or delay when it is apparent
that delay would exacerbate the medical condition, it does so, and

14

the delay is not medically justified.  Id. (citing Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187, 1187-89 (11th Cir. 1994)).

Here, the Plaintiff claims that Defendant Mathews' failure to provide Plaintiff with pain pills and a liquid diet constituted the deliberate indifference to Plaintiff's serious medical need in violation of the Eighth Amendment and constituted negligence in violation of state law.  Upon review of the record before the Court, it is clear that Plaintiff received prompt, thorough and recurring medical care after the Team action.  On October 17, 1999, immediately after the Team had Plaintiff secured in his cell and they had retrieved the razor blade from the back of the cell, Nurse Mills examined him.  Ex. B.[4]  Nurse Mills found a lip laceration. Ex. C-1.  Plaintiff was escorted out of his cell and taken to the clinic for a post use of force physical.  Ex. B.  The Emergency Room Record shows that Nurse Mills found a 1/2" x 1/16" deep inner lower lip laceration and a 1/2" x 1/16" deep outer lower lip laceration.  Ex. C-2.  She found a chip in the right central incisor.  Id.  No loose teeth were found.  Id.  She noted a raised area in the zygomatic area of Plaintiff's face.  Id.  The bleeding of the lip was stopped with pressure.  Id.  The lacerations were cleaned, and steri-strips were applied to the outer laceration.

---

[4] The Court will hereinafter refer to Defendants' Exhibits (Doc. #21) (filed August 29, 2002) & (Doc. #103) (filed January 11, 2005) as "Ex." followed by the appropriate letter and numerical designation.

Id.  The Plaintiff was instructed to keep the area clean and dry and to get Tylenol from the wing officers for pain, if needed.  Id. He was further advised to report any signs or symptoms of infections and to request access to sick call if additional treatment was needed.  Id.  A referral to the dentist was completed and a notation to add on for wound care was made.  Id.

Several hours later, Nurse Myers checked Plaintiff and his lip was bleeding.  Ex. C-4.  Plaintiff complained about his bleeding lip, asked for pain pills and stated he needed a doctor.  Id. Plaintiff was seen chewing on his bottom lip, which pulled the steri-strips half-way off of his lip.  Id.  Plaintiff had no problem talking, he had a knot on his face, and he stated he could eat without a problem.  Id.  He demanded to see a dentist, but the nurse explained that the request for dental had already been completed.  Id.  Plaintiff ate over 60% of his meal.  Id.

Nurse Myers advised Plaintiff not to suck or chew on the cut, to leave the steri-strips alone, to wait for his dental follow-up on Monday, to ask for Tylenol from the wing officers and to access sick call in the morning for any complaint of pain.  Id.

The next day, October 18, 1999, Plaintiff was seen by Nurse H. Jolly and Defendant Mathews on the follow-up for the lacerated lip. Ex. C-5.  No neurological symptoms were noted.  Id.  The "TMJ" was non-tender.  Id.  The lower lip was swollen with erythema, there was a possible chipped incisor, and the right zygomatic arch area

was swollen and tender to palpation.  _Id_.  Plaintiff was referred for X-rays and a dental evaluation to rule out possible dental trauma and a right zygomatic fracture.  _Id_.

Plaintiff was seen and evaluated by the dentist, J. D. Poston on October 18, 1999, as well.  Ex. C-5.  He found that the distal incisor, edge of tooth #8, was fractured.  _Id_.  Due to Plaintiff's uncooperative behavior, he was unable to take X-rays of Plaintiff's mouth.  _Id_.  He rescheduled the taking of the X-rays for ten days later.  _Id_.  Plaintiff was referred to radiology for evaluation and to rule out any fracture of the facial bones.  Ex. C-13.

On October 18, 1999, in the afternoon, Plaintiff was back in the clinic for another emergency room visit after a use of force incident where Plaintiff claimed he was pushed down on a bench and bumped the back of his head on the wall.  Ex. 16, filed April 13, 2005.[5]  Plaintiff was seen by Nurse Schwender.  _Id_.  She found slight swelling near the right mid-line of the back of Plaintiff's head.  _Id_.  It was noted that Plaintiff has just been to dental. _Id_.  Plaintiff stated he wanted a soft diet and was not concerned with any pain or bumps.  _Id_.  There were no injuries requiring treatment.  _Id_.  Plaintiff was advised not to take any Tylenol or Motrin because head injury symptoms could be masked by medication. _Id_.

---

[5] The Court hereinafter refers to Plaintiff's Exhibits (Doc. #92), filed November 4, 2004, & (Doc. #115), filed April 13, 2005, as "Ex." followed by the appropriate number.

17

X-rays of the facial bones were taken on October 19, 1999, and no fracture was found.  Ex. C-5 & Ex. C-12.  Plaintiff was seen during sick call on October 21, 1999, by J. Christie.  Ex. C-7.  Plaintiff had numerous complaints (back pain, ankle pain, questions why he was not getting his mouth fixed, vision problems, and dandruff).  Id.  It was noted that Plaintiff was already on call-out for wound care.  Id.  Plaintiff was told to get Tylenol from housing and to go to sick call when needed.  Id.  He was referred for visual screening and given other instructions.  Id.

On October 22, 1999, Plaintiff declared a medical emergency.  Ex. C-8.  He claimed he had chest pains.  Id.  He also said he wanted his teeth fixed and to tell the dentist he wanted to see him.  Id.  Plaintiff was examined and no treatment was recommended and no problem was identified.  Id.  Plaintiff was advised to report to sick call for further problems.  Id.  Plaintiff was seen for visual acuity on October 25, 1999.  Ex. C-9.

On October 27, 1999, Plaintiff told the nurse he had a dental emergency because his mouth hurt.  Ex. C-10.  Nurse Collins examined Plaintiff's mouth and found no inflammation of the gums, no bleeding, no loose teeth and no erosion of the gum line.  Id.  She concluded that there was no emergency, no treatment was needed and Plaintiff should obtain Tylenol for pain.  Id.  He was told to use sick call in the morning.  Id.

18

Later on, Plaintiff told Nurse Collins that his mouth was hurting and Tylenol was not working.  Id.  Again, she noted no bleeding, no loose teeth and no inflammation.  She determined that there was no emergency, but she referred Plaintiff to the dentist for evaluation.  That same day, Plaintiff saw the dentist, Dr. Poston.  Id.  He noted no mobility of Plaintiff's teeth or other fractures.  Ex. C-13.  Plaintiff complained about sensitivity in the area of his chipped tooth.  Id.  An X-ray of the tooth was taken and Dr. Poston bonded the tooth.  Ex. C-13 & Ex. C-14.  Dr. Poston prescribed twelve tablets of Motrin 400 mg for pain.  Ex. C-10 & Ex. C-14.

The Court will assume for the purposes of this order that Plaintiff had a serious medical need.  Even assuming, without deciding, that Plaintiff has demonstrated a sufficiently serious medical need, Defendant Mathews was not deliberately indifferent to any "serious" medical needs.  Quite to the contrary, the chronology of his medical and dental evaluations and treatments reflects that the medical and dental staff promptly evaluated his medical condition, promptly treated the condition and continued to respond to his complaints in a timely and concerned fashion.

In particular, Plaintiff complains that Mathews failed to provide him with pain pills and a liquid diet.  The day before Plaintiff was seen by Mathews, Plaintiff had been advised to get Tylenol from the wing officers for pain, as needed.  Plaintiff does

19

not assert that the Tylenol was unavailable or otherwise restricted.  The Court notes that after seeing Defendant Mathews and the dentist on October 18, 1999, Plaintiff was back in the clinic due to a use of force incident where Plaintiff was pushed down on a bench and bumped the back of his head.  At that time, the nurse advised Plaintiff not to take any Tylenol or Motrin because head injury symptoms could be masked by medication.  Thus, it is clear that even if Plaintiff had obtained Tylenol from the wing officers, he was advised not to take it due to the head injury. The precaution taken by the nurse in advising Plaintiff not to take pain medication was clearly out of concern for his present condition and not for the purpose of inflicting undue pain.

The next day, on October 19, 1999, Plaintiff was told to get Tylenol for his complaints about pain in his back and ankle.  On October 27, 1999, when Plaintiff told the nurse Tylenol was not relieving the pain in his mouth, she referred Plaintiff to the dentist.  Plaintiff was promptly seen that same day and was prescribed Motrin 400 mg for pain.

Based on the record before the Court, Plaintiff saw Defendant Mathews on one occasion.  The medical record from the previous day showed that he was able to eat 60% of his meal.  It also showed that he had been advised to get Tylenol from the wing officers for pain.  Mathews examined Plaintiff and found a swollen lower lip, a possible chipped incisor and a swollen right zygomatic arch area.

20

Mathews immediately referred Plaintiff for X-rays and a dental evaluation.  That same day, Plaintiff was seen by the dentist, Dr. Poston, who did not "deem it necessary to prescribe medication or pain relievers for Plaintiff."  Ex. L at 2.

Dr. Poston attested:

> Inmate Green received appropriate dental and medical treatment for his injuries to his lip and tooth.  The injuries were minor, the cut on his lip was appropriately treated by medical staff, and medical staff properly referred inmate Green to me for his chipped tooth and claim of associated pain.  Upon examination of inmate Green on October 18, 1999, his condition did not require immediate attention nor warrant prescribing pain medication or a soft food diet at that time. Not all chipped teeth hurt.  Based upon my experience, small chips of the enamel of the teeth are rarely painful, and I would not have anticipated that on October 18, 1999, inmate Green's chipped tooth would have caused him significant pain or be more than mildly sensitive to food or temperature.  The use of acetaminophen (Tylenol) for complaints of pain associated with a chipped tooth is proper and common, and medical staff appropriately treated inmate Green's initial complaints of pain by providing him with Tylenol upon request.  On October 17, 1999, I prescribed a low dose of Motrin for inmate Green because he continued to complain of pain, and he claimed that the Tylenol was not alleviating his pain.

Ex. L at 2-3.

There was no deliberate indifference to Plaintiff's medical needs by Defendant Mathews.  He examined Plaintiff and immediately referred him to a dentist and for X-rays.  Pain medication was available on the wing, and Plaintiff had been previously advised to

obtain that medication from the wing officers.  Plaintiff was able to eat 60% of his meal the day before.

"If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight." Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (quoting Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1977)).  More specifically,

> The Eighth Amendment requires that inmates be provided "'well-balanced meal[s], containing sufficient nutritional value to preserve health.'" Green v. Ferrell, 801 F.2d 765, 770 (5th Cir. 1986) (quoting Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977)) (footnote omitted); see also Eason v. Thaler, 73 F.3d 1322, 1327 (5th Cir. 1996) (per curiam) ("To comply with the Constitution, inmates must receive 'reasonably adequate' food."). "The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'" Talib, 138 F.3d at 214 n.3 (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (internal quotations omitted). "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation." Id.  Even on a regular, permanent basis, two meals a day may be adequate.  Green, 801 F.2d at 770-71.

Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999).  In Berry, the inmate was deprived of eight meals over an eight month period, with no claim that his health was at risk.  The claim was found to be frivolous.

Here, the Court is convinced that by not being able to eat full meals for a one-week period, Plaintiff was not deprived of anything close to a "minimal measure of life's necessities." The medical records do not show that Plaintiff suffered a health-threatening weight loss during this period.  Plaintiff may have felt some hunger pains and may have felt some discomfort while eating solid foods, however, there is no Eighth Amendment violation.  None of the medical personnel that saw Plaintiff determined that Plaintiff should be placed on a liquid diet.  In particular, the dentist, Dr. Poston, did not recommend a liquid diet.  As attested to by Defendant Mathews:

> On October 18, 1999, the date I examined Inmate Green, he had a knot on his face, a cut lip, and a questionable chipped tooth.  He was not in any acute distress, was not bleeding, and was not suffering from any life threatening or serious injury.  Therefore, I referred him for x-rays of his face and to the dentist so the dentist could make any necessary decisions related to Inmate Green's dental complaints.  It is my job to see inmates, hear their medical complaints, examine them and provide treatment if needed in the situation, and if necessary refer them for further appropriate medical evaluations and treatment.  Inmate Green had a dental complaint, so I referred him to the dentist. Inmate Green saw the dentist that same day. Any diagnosis of Inmate Green's dental condition, and any decision regrading [sic] the treatment of Inmate Green's dental condition, including whether to prescribe pain medication or arrange a special diet for him, would be the dentist's decision.  All the medical providers afforded appropriate care.

Ex. D at 3.

23

As a matter of law, none of the actions of Defendant Mathews would constitute deliberate indifference to a serious medical need. Plaintiff received prompt and thorough medical attention.  Indeed, the medical attention he received after the use of force was rather exhaustive under the circumstances.

The fact that Plaintiff was dissatisfied with the type of treatment he received does not mean he was subjected to cruel and unusual punishment.  At most Plaintiff has shown a disagreement with the course of treatment:  "[A] difference of opinion over matters of medical judgment does not give rise to a constitutional claim."  Tedesco v. Johnson, 119 F.Supp.2d 1320, 1327 (M.D. Fla. 2000) (citing Massey v. Hutto, 545 F.2d 45 (8th Cir. 1976)).

There was no inadvertent or negligent failure by Defendant Mathews to provide Plaintiff adequate medical care either.  He saw Plaintiff on one occasion for a follow up visit for his lip injury. Plaintiff had already been treated for his injury and had been told to obtain Tylenol for pain.  Mathews made the assessment that Plaintiff had possible dental trauma and a possible right zygomatic fracture, which needed to be ruled out.  He promptly referred Plaintiff for a dental evaluation and X-rays.  Plaintiff has not presented facts supporting even a claim of negligence in the Defendant's treatment of Plaintiff's medical condition.

**B.  Excessive Use of Force**

Plaintiff claims that Defendant Hall's alleged use of excessive force subjected Plaintiff to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and constituted a violation of Florida tort law on assault and battery. Viewing the facts in the light most favorable to Plaintiff, as the Court must on a motion for summary judgment, Defendant Hall's motion for summary judgment will be denied.

Plaintiff alleges that he was already on the ground and was instructed to turn over to be cuffed. He states that leg irons and handcuffs were applied. In essence, Plaintiff contends that he had already been subdued when Hall lifted up Plaintiff's head off the floor and rammed Plaintiff's face into the floor. In viewing the evidence in the light most favorable to Plaintiff, the injuries Plaintiff suffered during the use of force could have been caused by such an action.

The Court recognizes, of course, that the Defendants' version of what transpired on October 17, 1999, is quite different from Plaintiff's version. The Incident Report of G. S. Anders states:

> Captain Chastain walked to cell B1201S and ordered Inmate GREEN, Eric, B/M, #192172, several times to give him the razor blade he had. Inmate GREEN refused all orders. Captain Chastain ordered the cell door opened and for the cell extraction team to enter. I entered first followed by Sergeant W. R. Hall, Sergeant J. Rizer, Sergeant J. Lynn and Sergeant J. H. Wilson. I struck Inmate GREEN'S right shoulder area with the shield and drove him to the back of the cell and to the floor face down. Once the team had

25

control of Inmate GREEN, I pulled the shield
up and backed up to the front of the cell.
Sergeant Hall and Sergeant Rizer held Inmate
GREEN'S arms behind his back and applied
handcuffs while Sergeant Lynn and Sergeant
Wilson held his legs down and applied leg
irons.  Sergeant Wilson retrieved the razor
blade and removed it from the back of the
cell.  Sergeant Hall and Sergeant Lynn then
lifted Inmate GREEN to his feet while Nurse
Mills examined him.

Ex. B.

Defendant Hall described the type of force he used:   "I
grasped Inmate GREEN, ERIC #192172 [sic] left arm with both of my
hands and held it behind his back until handcuffs were applied.  I
held him on the floor while nurse Mills examined him.  I then
lifted him to his feet and escorted him to the clinic."  Ex. E.  In
his Affidavit, Defendant Hall attests:

On October 17, 1999, at approximately
2:15 a.m., Captain Chastain summoned me and
other correctional officers to report to the
dress-out room to prepare for a cell
extraction.  Captain Chastain informed me and
the rest of the cell extraction team of the
situation regarding Inmate Green who was on
suicide watch and had a razor blade that he
refused to give up.

We walked towards Inmate Green's cell,
and we waited on the wing while Captain
Chastain approached Inmate Green's cell.
Captain Chastain ordered Inmate Green to give
him the razor, but Inmate Green refused.
Thereafter, Captain Chastain ordered the cell
door open.

Sergeant Anders entered the cell first
with a shield.  Then Sergeant Rizer and I went
in, followed by Sergeant Lynn and Sergeant
Wilson.  Sergeant Anders pushed Inmate Green

26

with the shield to the back of the cell and
face down on to the floor.  Sgt. Rizer and I
grabbed Inmate Green's arms, placed them
behind his back, and applied handcuffs to his
wrists.  Sgt. Lynn and Sgt. Wilson held down
his legs and applied leg irons on Inmate
Green.  Sgt. Wilson retrieved the razor blade
from the back of the cell.  I held Inmate
Green while Nurse Mills examined him, then I
helped escort him to the medical clinic for a
post use of force physical.

At no time did I lift Inmate Green's head
and push it into the floor.

At no time did I see any other cell
extraction team member lift Inmate Green's
head and push it into the floor.

Ex. K (numeration omitted).

From the Defendants' version of the events that transpired on

October 17, 1999, the injuries Plaintiff suffered could have

occurred when the shield was used to drive him to the back of the

cell and to the floor face down.  There are clearly conflicting

versions of what occurred during the use of force.

With that being said, the Court is convinced that the only

action that could be found to be the excessive use of force is the

alleged ramming by Defendant Hall of Plaintiff's face into the

floor.  The other actions of the officials are basically undisputed

and were reasonable under the circumstances.  Plaintiff, who was on

suicide watch, had a razor blade in his mouth, was threatening to

use it and refused to give the razor blade up.  Ex. B.  The

officials believed the razor blade was in Plaintiff's mouth.

Although Plaintiff claims he swallowed the razor blade prior to the

actions of the Extraction Team, the razor blade was found on the floor of the cell after the Team's use of force. Id. Before the Team went into Plaintiff's cell, it was decided that chemical agents were inappropriate to use to recover the razor blade from Plaintiff due to Plaintiff being in a suicidal setting. Ex. N. The E.R.D. shield was not utilized due to the belief that Plaintiff had the a razor blade in his mouth and the fear that there might be an involuntary muscle reaction to that type of shield. Id. Thus, the Cell Extraction Team went into the cell to retrieve the razor blade and a regular shield was used.

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citations omitted). When prison officials are accused of using excessive physical force, the initial inquiry is that set forth in Whitley v. Albers, 475 U.S. 312, 320-21 (1986): whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. at 6-7.

The seminal case concerning an inmate's claim of excessive force against a cell extraction team is Skrtich v. Thornton, 280 F.3d 1295 (11th Cir. 2002). The Eleventh Circuit explained:

> To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of

28

> force, the relationship between that need and
> the amount of force used, the threat
> reasonably perceived by the responsible
> officials, and any efforts made to temper the
> severity of a forceful response."

Id. at 1300 (citations omitted).  In addition, "an officer who is
present at the scene and who fails to take reasonable steps to
protect the victim of another officer's use of excessive force can
be held personally liable for his nonfeasance."  Id. at 1301.

The Hudson Court rejected a "significant injury" requirement.
The absence of serious injury alone is insufficient to dismiss a
prisoner's Eighth Amendment claim.  Hudson v. McMillian, 503 U.S.
at 7.  "When prison officials maliciously and sadistically use
force to cause harm upon an inmate, contemporary standards of
decency always are violated."  Id. at 9 (citation omitted).  Such
is true whether or not significant injury is evident.  Id.
However, not every malevolent touch by a prison guard gives rise to
a federal cause of action.  Id. (citing Johnson v. Glick, 481 F.2d
1028, 1033 (2nd Cir. 1973) ("Not every push or shove, even if it
may later seem unnecessary in the peace of a judge's chambers,
violates a prisoner's constitutional rights")).

> The Eighth Amendment's prohibition of "cruel
> and unusual" punishments necessarily excludes
> from constitutional recognition de minimis
> uses of physical force, provided that the use
> of force is not a sort "'repugnant to the
> conscience of mankind.'" Whitley, 475 U.S., at
> 327, 106 S.Ct., at 1088 (quoting Estelle,
> supra, 429 U.S., at 106, 97 S.Ct., at 292)
> (internal quotation marks omitted).

29

Id. at 9-10.

Clearly, some amount of force was justified when Plaintiff refused to turn over the razor blade and refused to comply with the directives of the officers.  Under the circumstances, the decision to use a Cell Extraction Team was made in a good-faith effort to restore safety and security to the institution.[6]  Once Plaintiff was placed in handcuffs and leg irons in his cell, the need for the application of force was over.  If Plaintiff's allegations of the head slamming are taken as true, there was no effort to temper the severity of a forceful response.  Plaintiff suffered a significant injury.  Again, once Plaintiff was in handcuffs and leg irons, the threat to the safety of staff and Plaintiff was minimal, with perhaps some concern that Plaintiff still had the razor blade in his mouth or on his person, until it was found on the cell floor.

Plaintiff has produced sufficient evidence to survive summary judgment on his claim that Defendant Hall used excessive force against him by slamming his face on the floor of the cell after Plaintiff was restrained in handcuffs and leg irons.  Here, the use of force, as described by Plaintiff, was excessive, and if believed by the jury, could be found to be repugnant to the conscience of mankind.  The amount of force used, as alleged by Plaintiff, was

---

[6] It is most notable that Plaintiff was already on suicide watch, he had a dangerous instrument in his possession, and he was placing the instrument in his mouth.  Clearly, there was need for action to prevent Plaintiff from injuring himself or others who may have come in contact with him.

not the amount needed to secure the situation where an inmate was already in restraints.  As described, there was no security need for the application of this level of force.

This is not a mere dispute over the reasonableness of the particular use of force.  See Brown v. Smith, 813 F.2d 1187, 1189 (11th Cir. 1987) (per curiam).  Plaintiff has submitted sufficient operative facts and evidence to survive summary judgment, as the type of force alleged would not necessarily be used in a good faith effort to restore security, but rather may be used maliciously and sadistically to cause harm.   There remain genuine issues of material fact in dispute preventing the Court from resolving Plaintiff's claim against Defendant Hall on summary judgment.

Next, Plaintiff asserts that Defendants Lynn, Anders, Wilson and Chastain failed to intervene to prevent the misuse of force by Defendant Hall, resulting in a violation of the Eighth Amendment of the United States Constitution.[7]  The Court agrees with Defendants that there were no reasonable steps that could have been taken by these Defendants to prevent Defendant Hall from allegedly slamming Plaintiff's face on the floor.  The Defendants did not have the time or ability to intervene and to prevent the single assaultive action allegedly taken by Defendant Hall.  See Skrtich, 280 F.3d at 1301.

---

[7] Although Plaintiff attempted to circumvent summary judgment by changing his complaint, those changes were not allowed for the reasons stated in the Court's Order (Doc. #90), filed September 10, 2004.

Plaintiff states in the statement of facts that another inmate yelled to him and asked if he was alright. Plaintiff responded, and Hall allegedly grabbed Plaintiff's head, lifted it up while telling him to "shut the fuck up," and then rammed Plaintiff's face into the floor. There were no reasonable steps that the other Defendants could have taken which would have protected Plaintiff from this event. The action described was sudden and unexpected. Also, it was a single action. No further acts of violent force followed.

Defendants Lynn, Anders, Wilson and Chastain's motion for summary judgment will be granted. Plaintiff's allegations show that the face slamming happened when Plaintiff yelled out to another inmate, and it happened unexpectedly, quickly and only once. This was not an episode of sufficient duration for an officer to react and to prevent the excessive use of force of another officer.

## C. Moore and Crosby

Plaintiff contends that Defendants Moore and Crosby's failure to take disciplinary action or other actions against Defendant Hall to curb his use of excessive force against inmates, and their failure to remove him from the Cell Extraction Team resulted in Plaintiff being assaulted by Defendant Hall in violation of the Eighth Amendment and state negligence law. In support of this claim, Plaintiff contends that Moore and Crosby had been placed on

notice of the abusive conduct of Hall as well as other officers by letters, complaints and grievances, but failed to take disciplinary or other actions against them.  Further, Plaintiff alleges that Moore and Crosby, although being aware of Hall's tendency to use excessive force, allowed him to remain on the Cell Extraction Team. Finally, Plaintiff asserts that Moore and Crosby failed in their duties to properly hire, train, assign, direct, supervise and discipline officers, and this failure led correctional officers to believe that they could violate inmates' rights with impunity.

Plaintiff describes Defendant Crosby as being in charge of the supervision and discipline of all employees at FSP, and Defendant Moore as being responsible for the supervision and discipline of all of the employees of the Florida Department of Corrections.  The Eleventh Circuit recently stated:

> It is also "well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). Supervisory liability under § 1983 occurs only when "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Id.  A causal connection may be established: (1) when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [or she] fails to do so"; (2) when "a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or (3) when "facts support an

33

> inference that the supervisor directed the
> subordinates to act unlawfully or knew that
> the subordinates would act unlawfully and
> failed to stop them from doing so." Id.
> (internal punctuation, quotation marks, and
> citations omitted).

Miller v. King, 384 F.3d 1248, 1261 (11th Cir. 2004).

Respondeat superior is a theory of liability not available for claims raised pursuant to 42 U.S.C. § 1983. Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996); Harris v. Ostrout, 65 F.3d 912, 917 (11th Cir. 1995). Although personal participation is not specifically required for liability under section 1983, there must be some causal connection between the defendant named and the injury allegedly sustained. Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991); Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam).

The Court is convinced Plaintiff has failed to show any connection between the above-mentioned Defendants and Plaintiff's alleged injuries. Plaintiff has failed to show that Defendants Moore and Crosby played any role in the alleged assault by Hall. There is no evidence or supporting operative facts showing that Moore and Crosby personally participated in the alleged unconstitutional conduct.

Plaintiff suggests that there is a causal connection between the Defendants' alleged failure to act and the alleged assault. Plaintiff asserts that the supervisory officials failed to curb the actions of Defendant Hall by disciplinary sanctions or other

34

measures and they failed to remove him from the Cell Extraction Team.

First, it is clear that Plaintiff has not shown that Defendants Moore and Crosby directed their subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them. There is nothing before the Court which shows that these supervisory officials told officers to abuse inmates or that they knew that the officers were going to enter Plaintiff's cell and utilize excessive force. Plaintiff has completely failed to show that there was some sort of custom and policy of allowing unbridled assaultive behavior by correctional officers.

Plaintiff urges this Court to find that there was a history of widespread abuse which put these supervisory officials on notice of the need to discipline, curb and stop abusive actions of their subordinates. Plaintiff has utterly failed to show such a history of widespread abuse which would have placed the Defendants on notice to correct the problem. In fact, Ed Sobach, the Inspector Supervisor for the Inspector General's Office with the Florida Department of Corrections attests:

> On February 9, 2004, I reviewed all the Inspector General investigations between October 1998 and October 1999 involving defendants Sgt. William Hall, Sgt. Joshua Lynn, Sgt. Gregory Anders, Sgt. Timothy Chastain, Sgt. Harold Kontaxis, and Sgt. James Wilson. There are no Inspector General reports or investigations of uses of force during a cell extraction occurring at Florida

35

State Prison from October 1998 through October
1999 involving these defendants.

Ex. M.

Plaintiff states that "on information and belief" several
inmates at FSP have complained to Defendants Crosby or Moore about
physical abuse or the use of excessive force by Defendant Hall and
"on information and belief" numerous inmates have filed complaints
to Defendants Crosby and Moore alleging physical abuse by security
staff at FSP. Plaintiff's Response to Defendants' Summary Judgment
Motion (Doc. #92), filed November 4, 2004, at 9-10.[8]  Clearly,
these vague and conclusory statements are not enough to withstand
Defendants summary judgment motion.   "The Rules are clear:
'Supporting and opposing affidavits *shall* be made on personal
knowledge.'  Fed.R.Civ.P. 56(e) (emphasis added).  Rule 56(e)'s
personal knowledge requirement prevents statements in affidavits
that are based, in part, "upon information and belief" --instead of
only knowledge-- from raising genuine issues of fact sufficient to
defeat summary judgment." Pace v. Capobianco, 283 F.3d 1275, 1278
(11th Cir. 2002).

Plaintiff did submit affidavits from five inmates in an
attempt to show that the Defendants were on notice of the alleged

---

[8] The Court notes that Plaintiff makes numerous statements, under the
penalty of perjury, where he states "based on information and belief"
certain things are fact.   See also Plaintiff's March 16, 2005,
Supplemental Response to Defendants' Supplement to Summary Judgment
Motion.   These statements "based on information and belief" will not
raise a genuine issue of fact.

history of widespread abuse by the correctional officials.  Ex. 3A, Ex. 3B, Ex. 4A, Ex. 4B and Ex. 4C, all filed on November 4, 2004. Three of the affidavits actually state that grievances were filed during the period from 1996 to 1999, and that the grievances contained complaints about physical abuse by a variety of correctional officials.  Ex. 3A, Ex. 3B and Ex. 4C.  There is no documentation, however, showing that these allegations were substantiated.  Further, Plaintiff does not submit any evidence demonstrating that Defendants Moore and Crosby were aware of or had any knowledge of these grievances or were aware of some pattern of abuse.

For example, if there was a disapproved use of force, the warden would be notified in writing, and the warden could take any needed corrective action.  See Exhibit 7, filed November 4, 2004. Plaintiff has failed to submit any documentation, affidavits or other evidence to show that there were any disapproved uses of force involving any of the Cell Extraction Team members to which Defendant Crosby received notice and failed to respond or to take corrective action.  In fact, Plaintiff has failed to show that there were any sustained grievances concerning allegations of abuse of inmates by officers that reached the attention of either Defendant Moore or Defendant Crosby where they failed to take corrective action.

37

Plaintiff has failed to show that there was evidence of a pervasive problem which would have come to the actual attention of Defendants Moore and Crosby prior to October, 1999.  At most Plaintiff has shown, besides himself, two complainants who filed against Defendant Hall, one who filed against Defendant Anders, two who filed against Defendant Chastain and one who filed against Defendant Wilson.  Certainly, these few grievances filed by a very small number of inmates at FSP does not demonstrate or adequately support a claim of widespread abuse.  "'The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous.' <u>Gonzalez</u>, 325 F.3d 1361 at ----, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted)." <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360-61 (11th Cir. 2003).

Plaintiff also claims that Defendants Moore and Crosby have failed to adequately train and supervise employees of FSP and the Florida Department of Corrections.  "The Supreme Court has held that inadequate police training may provide a basis for section 1983 liability only where failure to train amounts to deliberate indifference to the rights of persons with whom the [correctional officers] come into contact." <u>Popham v. City of Talladega</u>, 908 F.2d 1561, 1565 (11th Cir. 1990) (per curiam) (citing <u>Canton v. Harris</u>, 489 U.S. 378 (1989)).

Here, Plaintiff has failed to allege any specific facts connecting the supervisors with any alleged failure of staff to conduct a cell extraction appropriately, either from poor or inadequate training or through lack of supervision. See Cottone, 326 F.3d at 1361. The cell extraction was done by trained individuals following cell extraction procedures. There are extensive procedures for cell extractions and uses of force.[9] Plaintiff complains about an alleged isolated and rogue incident of an officer slamming Plaintiff's head to the floor after he was restrained. The Incident Report outlines the numerous procedures that were followed and the amount of decision making that was undertaken prior to entering Plaintiff's cell:

> After numerous verbal orders by assigned wing staff and myself to be handcuffed and relinquish the razor blade, authorization was granted from Duty Warden A. Thomas at 1:30 AM to use physical force if necessary in order to retrieve the razor blade. After several more verbal orders by this writer to give me the razor blade, all to no avail, a cell extraction team was utilized to restrain Inmate GREEN and subsequently remove the razor blade which was found on the floor in his

---

[9] The Court notes that some procedures were submitted to the Court *in camera*. See Defendants' Notice of Partial Compliance with Court's October 27, 2003 Order (Doc. #53), filed November 3, 2003. These procedures have not been revealed to Plaintiff due to security reasons and they will be maintained *in camera*. The Court is convinced that, although the documents will be maintained *in camera*, that decision has not negatively impacted Plaintiff's ability to adequately file an opposition to the motions for summary judgment. There is enough documentation available for review by inmates to show that there are rules and policies for cell extractions and uses of force, without providing inmates with the exact details of those procedures and policies, which may cause safety and security concerns.

cell. No staff were injured as Inmate GREEN
suffered a one-half (½) inch laceration to the
inside and outside of his mouth, thought to be
from the razor blade he had in his mouth
moments before I ordered the team to enter his
cell. Only the minimal amount of force was
used and was captured on video tape #96 by
Officer C.S. Burns. All staff involved have
received cell extraction training and
completed use of force reports. Chemical
agents were not utilized due to extenuating
circumstances. The ERD shield was not
utilized due to a weapon being involved and a
recommendation from the medical department, D.
Mill, RN. The razor blade was photocopied and
forwarded to the D.R. investigator. The EAC
(Parrish) was notified at 3:30 AM and an
investigative E-Form was completed.

Ex. B. See also Ex. 13, Report of Force Used, filed April 13,
2005.

As for supervision, Captain Chastain contacted the Duty Warden
to obtain authorization to use force. Ex. I. Authorization was
granted. Id. Captain Chastain directed the Team and instructed
them to report to the dress-out room to prepare for a cell
extraction. Id. Chastain informed the officers that Plaintiff
Green was on suicide watch and he had a razor blade that he refused
to give up. Id. The cell extraction was taped and the tape was
reviewed by the Duty Warden A. Thomas and by Defendant Crosby and
Assistant Warden George Sapp the day after the incident. Ex. N.
Thus, authorization was received from the Duty Warden prior to the
use of force, the Captain was there to direct the Team, the use of
force was taped and the use of force was investigated and reviewed
promptly by the supervising staff at FSP. Ex. N & Ex. O.

40

There has been no showing of deliberate indifference or negligence, and there has been no showing that there was a failure to train or supervise the corrections officials. See Ex. G, Ex. H, Ex. I, Ex. J & Ex. K.   Defendants Moore and Crosby's motion for summary judgment will be granted.

**D.  Qualified Immunity**

The Court recognizes that the defense of qualified immunity is not available to Defendant Hall.   In the Eleventh Circuit, "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in Hudson and Whitley." Skrtich, 280 F.3d at 1301 (citation omitted).   See Thomas v. Ferguson, 361 F.Supp.2d 435, 442 (D.N.J. 2004) (recognizing that malicious and sadistic use of force is always a violation of clearly established law; therefore, no protection is afforded to defendants through qualified immunity).   Thus, any assertion of qualified immunity by Defendant Hall is denied.

The remaining Defendants are entitled to raise the defense of qualified immunity from damages.   See Defendants' August 29, 2002, Motion to Dismiss and Motion for Summary Judgment (Doc. #21), which was adopted by the remaining Defendants.   The Eleventh Circuit has reviewed the qualified immunity principles.

> "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gonzalez, 325 F.3d at ----, 2003 WL 1481583, at *3 (quoting Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002)); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority. Gonzalez, 325 F.3d at ----, 2003 WL 1481583, at *4 (citing Vinyard, 311 F.3d at 1346).

Cottone v. Jenne, 326 F.3d at 1357-58.

In this case, the Defendants were acting within their discretionary authority as prison officials involved in daily correctional operations or in providing correctional medical care. See Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1267 n.13 (11th Cir. 2003), cert. denied, 125 S.Ct. 1399 (2005); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Thus, once Defendants have established that they were acting within their discretionary authority, the burden then shifts to the Plaintiff to show that the Defendants are not entitled to qualified immunity. The Supreme Court has established a two-part test to determine the applicability of qualified immunity.

> "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope, 122 S.Ct. at 2513. If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next,

42

> sequential step is to ask whether the right
> was clearly established." Saucier v. Katz,
> 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d
> 272 (2001).

Vinyard v. Wilson, 311 F.3d at 1358; Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (stating that a court reviewing a claim of qualified immunity must first determine whether plaintiff has alleged the deprivation of a constitutional right, and if so, then proceed to determine whether that right was clearly established at the time of the alleged violation); Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003), cert. denied, 541 U.S. 935 (2004).

The remaining Defendants have not violated Plaintiff's constitutional rights. Thus, "there is no need to proceed to the next step of determining if a constitutional right was clearly established." Smith ex rel. Smith v. Siegelman, 322 F.3d 1290, 1298 n.16 (11th Cir. 2003); Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1194 (11th Cir. 2003). It is clear that the Defendants, other than Defendant Hall, are entitled to qualified immunity.

## E.  Punitive and Compensatory Damages

Defendants assert that Plaintiff did not suffer more than a *de minimis* injury as a result of the alleged use of excessive force. Based on the record before the Court, the Court is unable to reach the conclusion that Plaintiff only suffered a *de minimis* injury. Plaintiff had lacerations of the mouth that were bleeding. The lacerations were treated and the outer laceration was steri-

43

stripped.   He had a chipped tooth which Plaintiff alleges caused pain, and which the dentist bonded after taking X-rays.   Also, the right zygomatic arch area was swollen and tender to palpation.   X-rays were taken to rule out a fracture.   Clearly, Plaintiff suffered trauma to his mouth and face.

Plaintiff's action is not barred by 42 U.S.C. § 1997e(e) as he describes and submits sufficient evidence supporting his claim that he suffered actual physical injury.   Plaintiff has clearly alleged and made a sufficient showing that he suffered a physical injury as a result of the altercation on October 17, 1999.   There remain disputed issues of material fact which prevent summary judgment for Defendant Hall.

## F.   Official Capacity Liability

Insofar as Plaintiff seeks monetary damages from Defendants in their official capacities, the Eleventh Amendment clearly bars suit.   Zatler v. Wainwright, 802 F.2d at 400.   Thus, any surviving claim for money damages will be against Defendant Hall in his individual capacity.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.   Defendants William Mathews, James Crosby, Michael Moore, Sergeant Lynn, Sergeant Wilson, Captain Chastain and Sergeant Anders' August 29, 2002, Motion to Dismiss and Motion for Summary Judgment (Doc. #21) and January 11, 2005, Supplement to Motion to

Dismiss and Motion for Summary Judgment (Doc. #103) are **GRANTED.** Judgment to that effect will be withheld pending adjudication of the action as a whole.  <u>See</u> Fed. R. Civ. P. 54.

2.   Defendant William Hall's August 29, 2002, Motion to Dismiss and Motion for Summary Judgment (Doc. #21) and January 11, 2005, Supplement to Motion to Dismiss and Motion for Summary Judgment (Doc. #103) are **DENIED**, and Defendant Hall shall answer the Complaint within **TWENTY (20) DAYS** from the date of this order.

3.   Within **FORTY (40) DAYS** from the date of this order, Plaintiff shall file a statement entitled **"Pretrial Narrative Statement."**  The Pretrial Narrative Statement shall contain:

(a)  A brief general statement of the case against the remaining Defendant, Defendant Hall;

(b)  A narrative written statement of the facts that will be offered by oral or documentary evidence at trial;

(c)  A list of all exhibits to be offered into evidence at the trial of the case;

(d)  A list of the full names and addresses and places of employment for all the non-inmate witnesses that Plaintiff intends to call (Plaintiff must notify the Court of any changes in their addresses);

(e)  A list of the full names, inmate numbers, and places of incarceration for all the inmate witnesses that Plaintiff intends to call (Plaintiff must notify the Court of any changes in their places of incarceration);

(f)  A summary of the anticipated testimony of <u>each</u> witness named in (d) and (e).

(g)  Notification to the Court of which inmate witnesses are on death row, if any.

45

4. Within **SIXTY (60) DAYS** from the date of this order, Defendant Hall shall file and serve upon Plaintiff a **"Pretrial Narrative Statement,"** entitled as such. The Pretrial Narrative Statement shall comply with paragraph 3 (a) through (g).

5. Failure of the parties to disclose fully in the Pretrial Narrative Statement or at the pretrial conference the substance of the evidence to be offered at trial will result in the exclusion of that evidence at the trial. The only exceptions will be (1) matters which the Court determines were not discoverable at the time of the pretrial conference, (2) privileged matters, and (3) matters to be used solely for impeachment purposes.

6. If Plaintiff fails to file a Pretrial Narrative Statement, as required by paragraph 3 of this order, paragraph 4 of this order shall be inoperative and Defendant Hall shall notify the Court of Plaintiff's failure to comply.

**DONE AND ORDERED** at Jacksonville, Florida this 25th day of May, 2005.

JOHN H. MOORE II
United States District Judge

sa 5/20
c:
Eric Green
Ass't A.G. (Callaghan)

46